UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| STATE FARM FIRE & CASUALTY COMPANY, BRIAN ARENDS, and ANN ARENDS | Plaintiffs |
| v. | Civil Action No. 3:19-cv-151 |
| AMAZON.COM, INC. | Defendant |

\* \* \* \* \*

### MEMORANDUM OPINION & ORDER

Defendant Amazon.com, Inc. ("Amazon") moves for summary judgment ("Motion"). [DE 21]. Plaintiffs State Farm Fire & Casualty Company, Brian Arends, and Ann Arends ("Plaintiffs") responded. [DE 26]. Amazon replied. [DE 37]. Both parties filed supplemental authority. [DE 47, 52]. For the reasons below, the Court **GRANTS in part** and **DENIES in part** Amazon's Motion. [DE 21].

### I.   BACKGROUND

*A. Undisputed Facts*

In November 2015, Helen Walter ("Walter") purchased two self-balancing electric scooters, commonly known as "hoverboards," that were listed on Amazon.com. [DE 26 at 351]. The seller of the hoverboards appeared on Amazon.com as "Cool5Pix," and Amazon's business records reflect that Cool5Pix fulfilled Walter's order. [DE 21-1 at 108-09]. According to its business records, "Amazon never touched" the hoverboards, as "Cool5Pix was responsible for sourcing the hoverboard, holding title to it, setting the price, and offering any warranty." [*Id.* at 109]. Walter gave one of the hoverboards to her grandson, Plaintiffs Ann and Brian Arends's (collectively "Arends") son, for Christmas in 2015. [*Id.* at 108]. The hoverboard was used by,

1

and remained in the residence of, the Arends family for just over two years. [DE 21-4 at 241; DE 21-5 at 290].

The Arends were aware of the risk of fire or explosion posed by overcharging a lithium battery. [DE 21-4 at 239-40; DE 21-5 at 289]. They learned of these risks through news reports and stories of lithium ion batteries exploding. [DE 21-5 at 289]. Ann Arends also recalls learning, through the hoverboard's manual, that charging the device for over four hours posed a risk of fire. [*Id.*]. To protect against this risk, the Arends enacted family "rules" as to the proper care and maintenance of the children's hoverboards. [*Id.* at 293; DE 21-4 at 239-40]. According to these rules, the children were never to let the hoverboards charge for longer than four hours, never charge them in their bedrooms, and never leave them charging while the house was empty. [DE 21-5 at 289]. The children were told that these rules were in place because of the risk of fire posed by the hoverboards' lithium ion batteries. [*Id.*]. According to the Arends, their children understood these rules and were fully capable of complying. [*Id.* at 291]. Ann Arends recalls discussing the risk of explosion and fire caused by Hoverboard lithium batteries at some point with a group of neighbors whose children also had hoverboards. [*Id.* at 293]. After this conversation, Ann Arends is confident that she reinforced the rules with her children. [*Id.*]. Brian Arends recalled that the rule against charging hoverboards when the house was empty was specifically in place to prevent overcharging when nobody would be present to monitor the charging time. [DE 21-4 at 240]. Neither Ann nor Brian Arends ever saw or heard about any communication from either Amazon or Cool5Pix about the safety or potential risks of their hoverboards. [*Id.* at 245, 250; DE 21-5 at 299, 298].

On February 5, 2017, the Arends' son left his hoverboard charging in the house when the entire family left for a Super Bowl party. [DE 21-5 at 301-01]. Less than an hour after the Arends

arrived at the party, a friend called them to let them know that their house was on fire, and that he had called 911. [DE 21-4 at 248-49]. Their house "was completely destroyed along with all of its contents[.]" [DE 26 at 352]. A couple of days after the fire, the Arends deduced that their son's hoverboard started the fire because there was a hole burned through the dining room floor in the shape of a hoverboard in the place the hoverboard had been charging. [DE 21-4 at 249-50]. Both Ann and Brian testified that, had they known that the hoverboard was plugged in when they were about to leave for the Super Bowl party, they would have unplugged it before they left. [DE 21-5 at 302; DE 21-4 at 248].

"The manufacturer of the hoverboards is not known[.]" [DE 1-1 at 10]. "[A]ll transactions and communications, as Ms. Walter knew, went through the Amazon website[,]" and "[a]ny communications between . . . Walter and Cool5Pix would be through the Amazon website." [DE 26 at 351].

On December 16, 2015, several days before the Arends' son received – and began using – the hoverboard, [DE 21-5 at 287], Cool5Pix sent an email to Walter using the Amazon platform. [DE 26 at 362]. It read:

> Dear valued customer, Wish you best [sic] for the coming Christmas! Now,we [sic] get notice from Amazon that the Hoverboards possibly is with safety issue. We have submitted Safety Certificate to Amazon and meanwhile, we would like to write you to erase your worry and get assured to use your Smart Scooters/Hoverboards relievedly. The Smart Scooters/Hoverboards you have from us,are [sic] made by Samsung Battery and UL-passed Adapter which have passed UL Certification(Underwriter [sic] Laboratories), CE Cerification(CONFORMITE [sic] EUROPEENNE), FCC Certification (Federal Communications Commission). Attached are Certification Documents of the UL for Samsung Battery and Adapter, FCC for the Scooters, for your reference. We have tested all the items both in the factory and our own warehouse in order to make sure these hoverboards are in good condition before we shipped it out. We have sold thousands of them all over the world, we never hear any safety issue from our clients so far.So [sic] do not worry about it and is relieved [sic] to use them. Thanks for your kind understanding. Any more question, please feel free to contact with us.
> Best Regards,

>     Icy
>     Cool5pix

[DE 21-3, Exh. 7 at 226-27]. Walter remembers glancing at this email herself, but she never sent it to the Arends. [DE 21-3 at 215]. Ann Arends testified that before the fire she never knew this email existed, and that she did not rely at all on the contents of this email. [DE 21-5 at 299].

Amazon also asserts it emailed individuals who had purchased hoverboards from listings on their website. [DE 1-1 at 15]. The email read:

> There have been recent news reports of safety issues involving products like the one you purchased that contain rechargeable lithium-ion batteries. As a precaution, we want to share some additional information about lithium-ion batteries and safety tips for using products that contain them. Please follow the link below for the information and safety tips:
> https://www.amazon.com/gp/help/customer/display.html?noteID-201976530
> If you'd rather not keep the product, please contact Customer Service to initiate a return:
> https://www.amazon.com/contact-us/
> If you purchased this item for someone else, please pass along this information to the recipient.

[DE 21-1 at 111-12]. It is not clear whether Walter received or read this email. [*See* DE 26 at 357]. Walter does not recall receiving it or reading it. [DE 21-3 at 218].

B. *Amazon's Knowledge of Hoverboard Defects*

Amazon asserts that it became aware of "press reports of hoverboard fires" in November 2015. [DE 21-1 at 111]. "In the ensuing weeks, Amazon's product safety team identified 17 reports of fire or smoke allegedly caused by a hoverboard sold through Amazon.com (by comparison, nearly 400,000 hoverboards were sold on the site in the last few months of 2015, with all but about 2,000 sold by third-party sellers)." [*Id.*]. "Damon Jones, the leader of Amazon's product safety team, called Amazon's investigation into hoverboards a 'deep dive investigation' on which he worked 'almost non-stop' from November 2015 through January 2016." [DE 1-1 at 12]. He "was concerned that the entire hoverboard product category was 'bad,' meaning that the

dangers of fires and explosions were spread across many manufacturers, many brands, and many component parts." [*Id.* at 13]. The "limited data available to Amazon did not establish that hoverboards as a category, or any particular hoverboard model or manufacturer, were a hazard[,]" but "the rate of hoverboard incident reports was lower than the rater for other products containing lithium-ion batteries." [DE 21-1 at 111]. Still, "out of an abundance of caution, [Amazon] decided on December 10, 2015, to remove hoverboard offers from the website until more information was available about potential safety risks." [*Id.*]. The Consumer Product Safety Commission ("CPSC") issued a letter in February 2016 "stating that it regarded as a potential 'substantial product hazard' any hoverboard that did not comply with a recently issued Underwriters Laboratories draft standard on hoverboards[,]" so it recalled "a few hoverboard models in July 2016, but" the recall did not involve "the hoverboard type that Ms. Walter purchased." [DE 21-1 at 112].

C. *Amazon's Relationship to Third-Party Sellers*

Amazon asserts that:

Amazon operates a website at www.amazon.com for sellers to offer products and buyers to purchase them. Although Amazon retails some products on its website, it is one of millions of sellers offering products there and it did not sell the hoverboards. Where Amazon is the seller, Amazon is listed as the seller on the product detail page, and Amazon sources the product, sets the price, and holds title. Here, Cool5Pix did all those things. Amazon's role in this transaction was providing services in the form of the online store where a buyer and seller consummated a sale.

Amazon makes clear to Amazon.com users in the *Conditions of Use* that govern its services that 'Parties other than Amazon operate stores, provide services, or sell product lines through the Amazon Services.' These *Conditions* explain that Amazon is 'not responsible for examining or evaluating, and we do not warrant the offerings of, any of these businesses or individuals or the content of their Web sites. Amazon does not assume any responsibility or liability for the actions, product, and content of all these and any other third parties.'

> Third parties who wish to sell products on Amazon.com must set up an account and assent to the *Amazon Services Business Solutions Agreement* ("BSA"). The *Selling on Amazon Service Terms* in the BSA describe 'a Service that allows [sellers] to offer certain products and services directly on the Amazon Sites[.]' They require sellers to 'ensure that [they] are the seller of each of [their] products; and to 'identify [themselves] as the seller of each of [their] Products on all packing slips or other information included or provided in connection with [their] Products on all packing slips or other information included or provided in connection with [their] Products and as the Person to which a customer may return the applicable product[.]'
>
> Third-party sellers are responsible for all aspects of the sale. In addition to deciding what and when to sell and sourcing the product, the sellers are 'responsible for any non-conformity or defect in, or any public or private recall of, any of [their] Products;' must provide 'accurate and complete Required Product Information for each product or service that [they] offer through any Amazon Site and promptly update that information as necessary to ensure it at all times remains accurate and complete'; set the price; must 'ensure that [their] Materials, [their] Products (including packaging) and [their] offer and subsequent sale of any of the same on any Amazon site comply with all applicable Laws …"; and offer any warranty of their choosing.
>
> When a user navigates to a product detail page, the seller is identified in the 'sold by' line. The seller is again identified on the order confirmation page before the user clicks the 'place your order' button.
>
> Amazon processes payment. It charges the payment instrument designated in the buyer's account and remits the purchase price to the third-party seller minus the service fees the seller agreed to in the BSA.

[DE 21-1 at 109-11] (emphasis and edits original) (citations omitted). Plaintiffs confirm that the receipt Walter received for the hoverboard purchase "shows that the hoverboards were 'sold by' Cool5Pix." [DE 26 at 351]. Plaintiffs do not dispute Amazon's representations about its relationship with third-party sellers but argue the legal significance of those relationships. [*See* DE 26].

### D. Procedural History

Plaintiffs originally sued in state court against Amazon and Samsung SDI Co., Ltd. [DE 1-1 at 9]. Amazon removed the matter to federal court invoking diversity jurisdiction under

28 U.S.C § 1332. [DE 1]. Plaintiffs voluntarily dismissed all claims against Samsung SDI Co., Ltd. [DE 18 at 95]. Plaintiffs allege that Amazon is liable for the damage caused by the hoverboard under theories of negligence (Count 2), [DE 1-1 at 17], strict products liability (Count 2), [*id.*], negligent failure to warn (Count 3), [*id.* at 18], "common law strict liability" (Count 4), [*id.* at 20], "strict liability" (Count 5), [*id.* at 21], assumed duty to warn (Count 6), [*id.* at 22], duty to warn premised on a special relationship (Count 7), [*id.* at 25], and another allegation of strict liability with an unknown manufacturer (Count 8). [*Id.* at 26]. Amazon seeks summary judgment on all claims, addressing them in three categories: "Plaintiffs' product liability claims[,] . . . . Plaintiffs' negligence claims[,] . . . . [and] Plaintiffs' seller-based claims[,]" [DE 21-1 at 114].

## II.     STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of specifying the basis for its motion and showing the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party must produce specific facts showing a material issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "Factual differences are not considered material unless the differences are such that a reasonable jury could find for the party contesting the summary judgment motion." *Bell v. City of E. Cleveland*, 125 F.3d 855 (6th Cir. 1997) (citing *Liberty Lobby*, 477 U.S. at 252).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations but must view the evidence and draw all reasonable inferences in a light most favorable to the non-moving party. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008); *Williams v. Int'l Paper Co.*, 227 F.3d 706, 710 (6th Cir. 2000). The non-

7

moving party must do more than show some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the non-moving party must show a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. Pro. 56(c)(1)(A)–(B); *see also Shreve v. Franklin Cty., Ohio*, 743 F.3d 126, 132 (6th Cir. 2014). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Liberty Lobby*, 477 U.S. at 252.

Even though Amazon styles its motion as one for summary judgment, the motion failed to include a statement of undisputed and disputed facts with citation to the record as required by Rule 56(c). Plaintiffs also failed to provide a statement of disputed or undisputed facts, and did not style their Response "in the order and manner in which [Amazon] has framed its arguments." [DE 26 at 352].

### III.  DISCUSSION

Amazon argues that "[a]ll of Plaintiffs' claims fail as a matter of law." [DE 21-1 at 114]. More specifically, Amazon organizes Plaintiffs' claims into three groups, "product liability claims . . . . negligence claims . . . . [and] seller-based claims[,]" and argues that it is entitled to summary judgment as to each group. [*Id.*]. Plaintiffs do not respond to Amazon's arguments "in the order and manner in which [Amazon] has framed" them. [DE 26 at 352]. Instead, Plaintiffs discuss individual legal conclusions broken up under these headings: "Kentucky Product Liability Law – Duty to Warn[,]" "Duty to Warn – Assumed[,]" "Special Relationship[,]" "Amazon's status as a 'seller'[,]" "If Amazon is not a 'seller', then the KPLA does not apply[,]" "Final discussion of

certain related issues[,]" and "Communications Decency Act[.]" [*See* DE 26]. The Court will address the Motion as to two broad groups of claims: strict products liability claims, and all others.

*A. Products Liability Claims*

Amazon argues that Plaintiffs "fail the most basic element of a product liability claim, whether based on strict liability or negligence: the defendant must have manufactured or sold the product that caused the injury." [DE 21-1 at 114]. Plaintiffs argue that Kentucky's imposition of strict products liability is not so limited, and that because of a circuit split, "the question of how to define Amazon is novel and it is unique to each state and court that considers it." [DE 26 at 368].

In *Dealers Transport Co. v. Battery Distributing Co.*, the Supreme Court of Kentucky "adopted strict liability in tort for a defective product as expressed in § 402A of the Restatement (Second) of Torts." *Burke Enterprises, Inc. v. Mitchell*, 700 S.W.2d 789, 791 (Ky. 1985) (citing 402 S.W.2d 441 (Ky. 1966)). The Restatement (Second) of Torts § 402A(1) states:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> (a) the seller is engaged in the business of selling such a product, and
> (b) it is expected to and does reach the end user or consumer without substantial change in the condition in which it was sold.

In strict products liability cases arising under the Restatement (Second) of Torts § 402A, "the Kentucky practice has been to state the liability issue in the terms of Restatement: Did the defendant manufacture, sell or distribute the product in a defective condition unreasonably dangerous to the user?" *Ford Motor Co. v. Fulkerson*, 812 S.W.2d 119, 122 (Ky. 1991) (quotations and alterations omitted). This is because "[t]he liability imposed by section 402A is special liability limited to manufacturers and distributors engaged in the business of selling the product in question." *Griffin Indus. v. Jones*, 975 S.W.2d 100, 102 (Ky. 1998). Shortly after the Kentucky Supreme Court adopted the Restatement (Second) approach, the Kentucky General Assembly

9

enacted the Products Liability Act ("KPLA"). *Anderson v. Black & Decker, Inc.*, 597 F. Supp. 1298, 1200 (E.D. Ky. 1984). The "clear intent of the legislature was to restrict liability in products cases." *Id.* Under the KPLA, "a manufacturer shall be liable only for the personal injury, death or property damage that would have occurred if the product had been used in its original, unaltered and unmodified condition." Ky. Rev. Stat. § 411.320(1).

Under the *Ford Motor Co.* analysis, the issue is whether Amazon manufactured, sold, or distributed the hoverboard in a defective condition unreasonably dangerous to the user. Amazon argues that it did not manufacture, sell, or distribute the hoverboard, as the hoverboard was never in Amazon's control and was sold and fulfilled by Cool5Pix. [DE 21-1 at 114-24]. Plaintiffs argue that the KPLA does not limit or define "seller," but based on inclusive language used throughout the KPLA, the definition "is broader than simply one who sells," and includes those "who participate[] in injecting a defective product into the stream of commerce." [DE 26 at 371]. Though products liability derives from each state's common law, Kentucky courts have yet to define "manufacture, sell or distribute" as used in the products liability inquiry. Yet Kentucky law makes clear that a claim of strict products liability may only be brought against "manufacturers and distributors engaged in the business of selling the product in question." *Griffin*, 975 S.W.2d at 102.

Though each state has its own independent common law framework around strict products liability, several courts have considered Amazon's unique relationship with sellers and buyers. So, while not controlling, the rationales set forth by these courts helps to understand Amazon's involvement with products sold by third-party sellers. The Sixth Circuit has held that Amazon does not exercise substantial enough control over third-party sellers' products to be considered a seller of those products under the Tennessee Products Liability Act. *Fox*, 930 F.3d at 423-24. In

10

Maryland, strict products liability "is imposed on owners of personal property who transfer title to purchasers of that property for a price." *Erie Ins. Co. v. Amazon.com, Inc.*, 925 F.3d 135, 141 (4th Cir. 2019). "In this sense, a manufacturer, distributor, dealer, and retailer who own – *i.e.*, have title to – the products during the chain of distribution are sellers, whereas shippers, warehousemen, brokers, marketers, auctioneers, and other bailees or consignees, who do not take title to property during the course of a distribution but rather render services to facilitate that distribution or sale, are not sellers." *Id.* The Northern District of Illinois, predicting how the Illinois Supreme Court would resolve this issue, held that Amazon's "major role" in the transaction "was providing a venue and marketplace for third-party sellers . . . to connect with buyers[,] . . . . which is not sufficient to support a finding of strict liability." *Garber v. Amazon.com*, 380 F. Supp. 3d 766, 778 (N.D. Ill. 2019). Despite being subject to different common law frameworks, "every other court to consider the question of Amazon's liability has concluded that Amazon is not liable for defective products sold on its marketplace." *Id.* at 781 (collecting cases) (citing the same conclusion reached under California law, Ohio law, New York law, New Jersey law, Tennessee law, Maryland law, and Pennsylvania law).

Regardless of which approach Kentucky courts would use to define sellers for purposes of strict liability (transfer of title, control over the product, role in the transaction), Amazon did not sell or manufacture the hoverboard at issue. Amazon never held title to the hoverboard at issue. [DE 21-1 at 118-19]. Amazon similarly did not participate in the fulfillment of Walter's order. [*Id.*]. Amazon did not "design, manufacture, distribute, or sell the hoverboard, or write any warnings or instructions that accompanied it[,]" and "Cool5Pix was responsible for sourcing the hoverboard, holding title to it, setting the price, and offering any warranty." [*Id.* at 109]. While Amazon does act as a seller in some transactions it facilitates, Amazon's role for purposes of this

matter was that of a marketplace. [DE 21-1 at 109]. Even viewing the evidence in the light most favorable to Plaintiffs, Amazon cannot be considered a seller of the hoverboard for purposes of strict liability. Thus, Amazon's Motion is **GRANTED** on Plaintiffs' claims of strict products liability.[1] Amazon argues an alternative theory under which it is not liable for Plaintiffs' seller-based claims (the Communications Decency Act), [DE 21-1 at 133-36], however the Court need not analyze this alternative theory because Amazon's Motion is granted under the framework for products liability.

### B. Remaining Claims

#### i. Count Two (Product Defect)

Plaintiffs' Count Two alleges that Amazon is liable for the hoverboard's product defect under a theory of negligence. [DE 1-1 at 17]. "[W]hether a product is defective has different elements under negligence, under strict liability in tort, and under breach of warranty." *Williams v. Fulmer*, 695 S.W.2d 411, 414 (Ky. 1985). The negligence theory is one of "ordinary negligence, as recognized by [the Supreme Court of Kentucky] in *C.D. Herme, Inc. v. R.C. Tway Co., Ky.*, 294 S.W.2d 534 (1956)[.]" *Williams*, 695 S.W.2d at 413. "This means simply that a manufacturer should be required to exercise reasonable care to avoid foreseeable injury." *C.D. Herme*, 294 S.W.2d at 536. "The elements of a negligence claim are (1) a legally-cognizable duty, (2) a breach of that duty, (3) causation linking the breach to an injury, and (4) damages. *Patton v. Bickford*, 529 S.W.3d 717, 729 (Ky. 2016) (citing *Pathways v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003)). While "[t]he existence of a duty presents a question of law, . . . breach and injury are questions of fact for the jury to decide." *Est. of Thomas v. Jennie Stuart Med. Ctr., Inc.*, 2012 Ky. App. Unpub.

---

[1] This includes "Count Four" (common law strict liability under the Restatement (Second) of Torts § 402(A)), "Count Five" (strict liability), and "Count Eight" (under Ky. Rev. Stat § 411.340). [DE 1-1]. This also includes the strict products liability theory underlying "Count Two" (product defect), and the alternative theory underlying this claim (negligence) is discussed below. [*Id.* at 17-18].

12

LEXIS 922, *8 (Ky. Ct. App. Dec. 7, 2012) (citing *Pathways, Inc. v. Hammons*, 113 S.W.3d at 89 (Ky. 2003)).

Amazon argues that "[s]eller status is also a necessary element of Plaintiffs' product-defect-based negligence claims because it furnishes the duty element." [DE 21-1]. Plaintiffs do not provide legal authority supporting a duty on behalf of Amazon; in fact, none of Plaintiffs' cited cases found that Amazon was under a duty for allegedly defective products that its third-party sellers sold and fulfilled. [*See* DE 26 at 378] ("As to the negligence, [sic] claims, [an Arizona] Court stated that first a duty has to be identified and that the Plaintiff had failed to address where duties arose.") ("As to the negligence claims, they were . . . specific to Illinois state law, which applied to manufacturers only. The court acknowledged certain negligence claims were possible in Illinois, i.e., voluntary duty to warn, which might apply to Amazon, but that the record was simply devoid of facts to support such a claim.") ("As to the negligence claims, [a California] Court found that the Plaintiffs simply failed to point to a duty owed by Amazon pursuant to California law."). Finding no Kentucky authority that establishes whether Amazon has a duty under these facts, the Court must "predict how the [Supreme Court of Kentucky] would rule by looking to all the available data." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys. Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). "To be sure the holdings of other state courts may provide indications of what the highest court may do. However, such holdings are not absolute predictors." *Thomas v. Forest City Enters.*, Civ. Action No. 3:00-cv-764-H, 2001 U.S. Dist. LEXIS 16632, at *3 (W.D. Ky. Oct. 17, 2001).

Amazon provided Cool5Pix a marketplace to sell its hoverboard; Amazon did not create the product listing, did not provide the hoverboard, and did not fulfill the order. For the same reasons discussed within the products liability framework, *supra* Section III.A., Amazon was not

13

the seller or manufacturer of the hoverboard.  Additionally, akin that of a products liability claim, the "duty" in a negligent product defect claim in Kentucky is imposed on the "manufacturer or installer of an article[.]" *C.D. Herme*, 294 S.W.2d at 536.  Several courts, applying the negligence law of varied states, have concluded that Amazon does not owe a duty to consumers of products sold and fulfilled by a third-party seller.[2]

Count Two alleges that Amazon had a "duty . . . not to place the completed hoverboard and/or its battery pack on the market in a defective and unreasonably dangerous condition." [DE 1-1 at 18].  Plaintiffs' complaint also maintains that a negligent product defect claim imposes liability on "one selling or distributing a defective product." [*Id.* at 17].  So, because Amazon neither sold nor distributed the hoverboard, and Plaintiffs do not allege that Amazon acted negligently related to a *service* it provided, Plaintiffs have failed to establish that Amazon owed them a duty as to the hoverboard.  For these reasons, Amazon's Motion is **GRANTED** as to Count Two.

      ii.      <u>Count Three (Negligent Failure to Warn)</u>

In Count Three, Plaintiffs allege that Amazon breached a duty set forth in the Restatement (Second) of Torts § 388.  *See Lloyd v. Lloyd*, 479 S.W.2d 623 (Ky. Ct. App. 1972) (recognizing §

---

[2] *See State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 835 Fed. App'x 213, 216-17 (9th Cir. 2020) ("Because we conclude that Amazon was not the 'seller' for purposes of strict liability, State Farm's negligence claim also fails.  Absent a duty . . . and a breach of that duty, a negligence action fails.  Here, Amazon did not owe a special duty ot the injured party because it was not the seller." (citations omitted)); *Carpenter v. Amazon.com, Inc.*, 2019 U.S. Dist. LEXIS 45317, *18 (N.D. Cal. Mar. 19, 2019) ("Plaintiffs have failed to assert any legal source of duty and as such, there is no genuine issue of fact as to negligence.  Plaintiffs allege merely that Amazon 'owed a duty of ordinary care' to hoverboard purchasers like Plaintiffs.  But apart from this conclusory allegation, Plaintiffs offer no evidence of any legal duty on the part of Amazon to protect consumers from defective products."); *Garber v. Amazon.com, Inc.*, 380 F. Supp. 3d 766, 782 (N.D. Ill. 2019) ("The [plaintiffs] have not established that Amazon owed them a duty, which is a necessary element of their negligence claim."); *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 400 (S.D.N.Y. 2018) ("Because Amazon did not manufacture, sell, or otherwise distribute the allegedly defective coffeemaker to Eberhart, it owed no duty to him with respect to that product.  And Eberhart does not allege that Amazon acted negligently with respect to a *service* that it provided to him.").

388 as authoritative). Section 388, titled "Chattel Known to Be Dangerous for Intended Use[,]" states:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

Restatement (Second) of Torts § 388. Though not controlling, Comment C helps to understand that "suppliers," as used in Section 388, is intended to be broad in scope. Even so, the types of persons included as "suppliers" under Section 388 are unified by a common theme: they all have possession or control over the chattel. Restatement (Second) of Torts § 388 cmt. c. Plaintiffs argue that the hoverboard at issue "was supplied by Amazon, through Cool5Pix. One might also say, Cool5Pix supplied the product through Amazon." [DE 26 at 372]. Plaintiffs argue that this conclusion is supported by a case from the Northern District of Mississippi. [*Id.*] (citing *State Farm Fire and Cas. Co., v. Amazon.com, Inc. et al.*, No. 3:18-cv-166-M-P, 2019 WL 5616708 (N.D. Miss. Oct. 31, 2019). Plaintiffs do not provide any basis to suggest that Kentucky courts would extend the definition of "suppliers" beyond those actors with actual control over or possession of an allegedly dangerous chattel. Thus, for the same reasons the Court declines to treat Amazon as the "seller" or "manufacturer" of the hoverboard at issue,[3] the Court declines to categorize Amazon as the supplier of the hoverboard, whether directly or indirectly. As a result,

---

[3] *See supra* Section III.A.

Amazon was not subject to the duty outlined in the Restatement (Second) of Torts § 388. Amazon's Motion is thus **GRANTED** as to Count Three.

### iii. Count Six (Assumed Duty to Warn)

Count Six alleges that Amazon is liable under a theory of assumed duty to warn under the Restatement (Second) of Torts § 324A. "The Supreme Court of Kentucky has acknowledged the applicability of § 324A . . . in appropriate circumstances." *Roberson v. Louisville Gas & Elec. Co.*, No. 2003-CA-002513-MR, 2005 Ky. App. LEXIS 36, at *12 (Ky. Ct. App. Feb. 11, 2005) (citing *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530, 538 (Ky. 2003)). Section 324A states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
> (a) his failure to exercise reasonable care increases the risk of such harm, or
> (b) he has undertaken to perform a duty owed by the other to the third person, or
> (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Restatement (Second) of Torts § 342A. The Sixth Circuit has held that when Amazon sent its December 2015 email about hoverboard safety, it "assumed a duty to warn" buyers "of the dangers posed by the hoverboard[.]" *Fox*, 930 F.3d at 427. There is a fact issue as to whether Walter received the email Amazon sent to hoverboard buyers. [*See* DE 26 at 362] ("There are several questions about whether Amazon, who undertook a duty to warn buyers of the risks associated with hoverboards sold on its site, did so negligently[,]" and "whether the email it meant to send Ms. Walter, was sent at all."). Further, if Amazon did email Walter, the contents of the email present a fact issue as to whether Amazon "fail[ed] to exercise reasonable care to protect" hoverboard buyers. Restatement (Second) of Torts § 324A. "For instance, there is a genuine issue of material fact regarding whether [Amazon]'s failure to include certain information in the

16

December 12, 2015 email amounted to negligence." *Fox*, 930 F.3d at 427. Thus, summary judgment is not appropriate as to Count Six.

   iv. <u>Count Seven (Duty from Special Relationship)</u>

Finally, in Count Seven, Plaintiffs allege that Amazon had a duty to the Arends premised on Amazon's relationship with its third-party sellers. [DE 1-1 at 25-26]. This is a claim under the Restatement (Second) of Torts § 315, adopted by the Kentucky Court of Appeals in *Evans v. Morehead Clinic*. 749 S.W.2d 696, 699 (Ky. App. 1988). Section 315 states:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Restatement (Second) of Torts § 315. In Kentucky, "[w]ell-settled special relationships giving rise to a duty to control a third person's conduct include the relationships between parent and minor child, master and servant where the harm is committed with means supplied to the servant by virtue of the employment, owner of land or a chattel and the person using such, one who takes charge of a person with dangerous propensities and the person under control, and mental health professional and patient." *Grand Aerie Fraternal Ord. of Eagles v. Carneyhan*, 169 S.W.3d 840 (Ky. 2005).

> There is indeed a current running through the relevant Restatement sections [and the judicial opinions evaluating miscellaneous claims of special relationships], that in order for a special relation to exist between the defendant and the third person, the defendant must have the ability to control the third person's conduct. Moreover, the cases from which these sections derive indicate that the ability to control is not the fictitious control which provides the basis for vicarious liability. Instead, 'control' is used in a very real sense.

*Grand Aerie*, 169 S.W.3d at 853 (quoting *Estates of Morgan v. Fairfield Fam. Counseling Ctr.*, 673 N.E.2d 1311, 1322-23 (Ohio 1997)) (edits original; internal quotations omitted). "Courts that have evaluated claims to less well-settled special relationships have also sought evidence of an

17

ability to control in a manner that would be meaningful in the prevention of the harm that actually occurred." *Grand Aerie*, 169 S.W.3d at 852. "Not only must the control be 'real,' but it also must be related in some manner to the harm caused by the person under control, such that its exercise would restrict the person's ability to cause the harm. Absent such control, there is no special relationship giving rise to a duty of reasonable care." *Id.* at 853.

Plaintiffs argue that Amazon had a "special relationship to its sellers, customers, and end-users" which put it "in the best position to protect against the risk of harm." [DE 26 at 365]. However, the issue is not whether Amazon was in a better position than anyone else to protect against the harm;[4] it is whether Amazon's *relationship with Cool5Pix*, premised on Amazon's "ability to control" Cool5Pix, placed Amazon in the best position to protect against the risk of harm. *Grand Aerie*, 169 S.W.3d at 850. Plaintiffs allege no facts suggesting Amazon had actual control over Cool5Pix in any way meaningful to this action. Plaintiffs merely point to Amazon's knowledge of hoverboard dangers as the reason Amazon was under a duty to warn premised on a special relationship. [DE 26 at 365]. Viewing all facts in the light most favorable to Plaintiffs, nothing in the record suggests that Amazon had a special relationship with Cool5Pix that would trigger a duty to act on Amazon's part. Amazon and Cool5Pix were in an "arms-length independent contractor relationship[,]" and Amazon's only control over Cool5Pix would have similarly been at arms-length, whether by removing Cool5Pix's listed items or terminating their business relationship. [DE 21-1 at 128]. Though these actions would have removed Cool5Pix's

---

[4] Plaintiffs frame Count Seven as a "duty to warn" claim. Though "*Grand Aerie* mentions that courts outside of Kentucky have found special relationships rooted in the defendant's failure to warn potential victims of impending harm in certain situations, . . . the examples it provides point only to state/parolee and psychotherapist/patient relationships." *Wilburn v. United States*, 616 Fed. App'x 848, 856 (6th Cir. 2015) (citing *Grand Aerie*, 169 S.W.3d at 851-82). "Plaintiffs have provided no legal support indicating that the Kentucky Supreme Court would hold that such a duty would apply in the instant case[.]" *Wilburn*, 616 Fed. App'x at 856. So the Court will analyze this claim under the somewhat broader framework for a duty to control.

hoverboard listing from the Amazon.com website, they would not have precluded Cool5Pix from selling hoverboards to anyone in whatever condition it so chose and with whatever warnings it determined to be appropriate. Put differently, while removal of the listing potentially could have precluded Walter specifically from seeing the hoverboard listing on Amazon.com, such an outcome would not have ensured that the Cool5Pix hoverboard never entered the Arends' home.[5] This is because removal of the Amazon.com hoverboard listing would not have affected Cool5Pix's ability to market and sell its hoverboards to anyone across the internet. *See Grand Aerie*, 169 S.W.3d at 853-54.

Amazon does not have control over where Cool5Pix sources its products, what warnings Cool5Pix includes with its products, or what disclaimers or warnings are issued with its products. [DE 21-2 at 240; DE 21-1 at 128]. Similarly, though listing its products on Amazon.com might expose Cool5Pix to more consumers than an alternate listing site, Amazon in no way controls Cool5Pix's general ability to list and sell its products over the internet. For these reasons, Amazon was not in a special relationship with Cool5Pix that would create an independent duty for Amazon to control Cool5Pix. As a result, Amazon's Motion is **GRANTED** as to Count Seven.

### IV.     CONCLUSION

For the reasons stated above, **IT IS ORDERED** that:

(1) Amazon's Motion for Summary Judgment [DE 21] is **GRANTED in part** as to Counts Two, Three, Four, Five, Seven, and Eight of Plaintiffs' Complaint [DE 1-1];

(2) Amazon's Motion [DE 21] is **DENIED in part** as to Count Six;

---

[5] Given that there were other hoverboards in the Arends' home purchased from websites *other than* Amazon.com, [DE 21-5 at 285], removal of the hoverboard listing from Amazon would not have necessarily precluded the Cool5Pix hoverboard from reaching the Arends' home.

(3) Pursuant to the Magistrate Judge's Scheduling Order [DE 17], Counsel shall file a joint proposed scheduling order for the remaining claims within **fourteen (14) days** of this Order.

Rebecca Grady Jennings, District Judge
United States District Court

March 24, 2021